Nellie E. Yale, Respondent, *v.* William R. Curtiss, Appellant.

1. Breach of Promise to Marry — Establishment of Contract. While, in determining whether the facts in an action for breach of promise to marry constituted a contract, the court may not infer facts not sworn to, it may infer the meaning and intention of the parties.

2. Necessity of Contract. In the absence of fraud and deception, there must be a contract to marry, in order to support an action for breach of promise; there must be a meeting of the minds of the contracting parties, and the evidence must be of such a character as to justify a finding that such was the case.

3. Offer and Acceptance. No form of words is required to constitute a contract to marry, and a formal offer and acceptance is not necessary; but there must be an offer and acceptance sufficiently disclosed or expressed to fix the fact that the parties were to marry, as clearly as if put in formal words.

4. Courtship. Mere courtship, or even an intention to marry, is not sufficient to constitute a contract.

*Yale* v. *Curtiss*, 71 Hun, 436, reversed.

(Argued January 27, 1897; decided February 9, 1897.)

APPEAL from a judgment of the General Term of the Supreme Court in the fourth judicial department, entered September 30, 1893, which affirmed a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Edward B. Thomas* and *Howard D. Newton* for appellant. The court erred in refusing to charge that the plaintiff did not consider the conversation in 1887 as creating an engagement to marry her. (*Storey* v. *Brennan*, 15 N. Y. 526; *Foster* v. *People*, 50 N. Y. 601; *Coleman* v. *S. A. R. R. Co.*, 114 N. Y. 613.) The court erred in denying the motion for a nonsuit upon the whole case. (*Homan* v. *Earle*, 53 N. Y. 275.)   The court erred in permitting the plaintiff to testify that she understood from the conversation respecting the minister's trip to Europe that the defendant intended to ask her to accompany him abroad as his wife. (*Erben* v. *Lorillard*, 19 N. Y. 299; *Traver* v. *E. A. R. R. Co.*, 3 Keyes, 497; *Anderson* v. *R., W. & O. R. R. Co.*, 54 N. Y. 334; *Arthur* v. *Griswold*, 55 N. Y. 408; *Furst* v. *S. A. R. R. Co.*, 72 N. Y. 542; *Tabor* v. *Van Tassell*, 86 N. Y. 642; *People* v. *Smith*, 104 N. Y. 491; *Machen* v. *L. Ins. Co.*, 2 Civ. Pro. Rep. 28; *Clark* v. *Crandall*, 3 Barb. 612; *Newman* v. *Goddard*, 48 How. Pr. 363; *Green* v. *H. R. R. R. Co.*, 32 Barb. 34.)

*George W. Ray* for respondent. The judgment and order having been reviewed by the General Term, and affirmed upon the law and the facts, the Court of Appeals cannot reverse or review the case upon questions of fact unless it shall be found that there is no evidence whatever to support the verdict, in which case a question of law is presented. ` (*In re Cottrell*, 95 N. Y. 329; *Ensign* v. *Ensign*, 120 N. Y. 655; *Duryee* v. *Vosburgh*, 121 N. Y. 57; *People* v. *Stone*, 117 N. Y. 480; *Healy* v. *Clark*, 120 N. Y. 642.) A lawful mutual contract to marry was abundantly proved. (*Homan* v. *Earle*,

53 N. Y. 267; 1 Bishop on Mar. & Div. §§ 196, 197; *Crosier* v. *Craig,* 47 Hun, 86; *Hotchkins* v. *Hodge,* 38 Barb. 117; *Jennette* v. *Sullivan,* 63 Hun, 361; *Prescott* v. *Guyler,* 32 Ill. 312; *Pettingill* v. *McGregor,* 12 N. H. 179; *Kniffen* v. *McConnell,* 30 N. Y. 285; *Munson* v. *Hastings,* 12 Vt. 346; *Wagenseller* v. *Simmers,* 97 Penn. St. 465; *Vanderpool* v. *Richardson,* 52 Mich. 336; *Waters* v. *Bristol,* 26 Conn. 398; *Wightman* v. *Coates,* 15 Mass. 1; *Whitcomb* v. *Wolcott,* 21 Vt. 368.) The question whether or not the plaintiff and the defendant entered in a mutual contract to marry on the evening in May, 1888, or at the interview occurring at about that time, was for the jury. (*Homan* v. *Earle,* 53 N. Y. 267; *Button* v. *Hibbard,* 82 Hun, 289; 1 Bishop on Mar. & Div. §§ 196–200; *McNally* v. *P. Ins. Co.,* 137 N. Y. 389.) It was proper to prove the whole intercourse of these parties, from the time defendant commenced down to the time he terminated his attentions, for the purpose of showing the mutual feelings of the parties towards each other; the growth of affection; the formation of matrimonial intentions, and enabling the court and jury to give a proper construction to the acts and language of the parties when the actual contract was made. (*Button* v. *Hibbard,* 82 Hun, 289; *Vanderpool* v. *Richardson,* 52 Mich. 339.) This court cannot review this case on the evidence or set aside the verdict as against the evidence. (*Eisenlord* v. *Clum,* 22 N. Y. Supp. 574; *Kavanagh* v. *Wilson,* 70 N. Y. 177; *Gildersleeve* v. *Landon,* 73 N. Y. 609; *Nicholson* v. *Connor,* 8 Daly, 212; *Elwood* v. *W. U. T. Co.,* 45 N. Y. 554; *Wait* v. *A. Ins. Co.,* 13 Hun, 371; *Graves* v. *Santway,* 2 Silv. 67; *Hulpin* v. *Finch,* 2 Silv. 452; *Tuthill* v. *Hussey,* 4 Silv. 489.)

HAIGHT, J. This action was brought to recover damages for a breach of promise to marry.

The plaintiff, at the time of the trial, was twenty-eight years of age, residing with her parents in the village of Norwich. She was engaged in the teaching of music, and was a member and regular attendant of the choir and of the Con-

gregational church in that village. The defendant was born
in Norwich, lived there until the year 1865, when he went to
New York and became a clerk in the banking office of Fiske
& Hatch, and remained there for the period of nineteen years.
In the fall of 1884 he returned to Norwich, where he had
inherited property upon the death of his father, and took up
his residence with Mrs. Chapman, his sister. At the time of
the trial he was forty-six years of age, had received an aca-
demic education, and upon his return to Norwich became a
member and regular attendant of the choir of the Congrega-
tional church. On the 16th day of December, 1885, he was
introduced to the plaintiff at a wedding in that village, and
on or about the first of January thereafter he accompanied
her home from an evening prayer meeting, and subsequently
escorted her to a band concert. He then went to the city
of New York and remained several weeks. After his return
to Norwich he again accompanied her home in the evening
from church and prayer meeting from time to time during
the spring and fall of that year, and occasionally during
the summer, and these attentions continued through the
year 1887 and until the early spring of 1888. He also
escorted her to three entertainments during the spring
of 1886, three more during the winter of 1886 and 1887,
and one in the early spring of 1888. He also took her
out riding on one or two occasions. After walking home
with her he often entered the house upon her invitation and
visited with her in the parlor until 10 or 11 o'clock, but never
remaining after that hour. He did not always escort her
home when he met her at church. On some occasions he
escorted other young ladies, and did not always accept her
invitation to go in upon reaching her home. He never called
upon the plaintiff at her house except when he called to take
her to the entertainments mentioned, and the occasions on
which he accompanied her home from church. In the spring
of 1888 he made the acquaintance of a Miss Hall in that vil-
lage and began paying his addresses to her. He escorted her

76

to a banquet and other entertainments, and in June announced his engagement to her, and in the spring of 1889 they were married. There was never any express offer of marriage made by the defendant to the plaintiff or an acceptance by her. It is claimed, however, that such offer and acceptance should be inferred from what was said and done. We shall, therefore, specifically call attention to the conversations from which it is claimed that a mutual promise to marry was understood between them. At the first time he accompanied the plaintiff home from prayer meeting in January, 1886, he spoke about the plaintiff being a friend of a Mr. Bishop who lived in New York, and of her being there the winter previous and said: "I am going to New York soon and I wish you were there this winter instead of last, because I would like to accompany you to entertainments which I am expecting to enjoy when I am there." In the summer of 1887, their minister, a Mr. Upton, was going to Europe. On one occasion when the defendant was accompanying the plaintiff from church he remarked that Mr. Upton was very anxious that he should accompany him to Europe, but he said that he preferred to wait until another year; that he would like to remain longer than Mr. Upton was going to remain. At this, the plaintiff stated that she hadn't any particular desire to go to Europe on account of her fear of crossing the water. Nothing more was said upon the subject until they reached her home, at which time the defendant said: "Honestly and truly, would you allow the fear of the water to prevent you from going if you could go just as well as not?" The plaintiff made no direct reply to this question, but after a little said that it would be very lonesome for Mr. Upton to go alone, and that she thought it would be much pleasanter for him to go in a party; to which he replied: "Husband and wife is party enough for me if I go." On another occasion, in the year 1888, at the time the defendant took the plaintiff out riding, we are told that they drove down South Broad street, and that in passing down the street he pointed out two vacant lots and asked her which

location she liked best. He made no further remark with
reference to the lots on that occasion, but on a former occa-
sion he had remarked to her that he was going to build the
nicest house in Norwich. On several occasions when the
plaintiff had invited him in after he had accompanied her
from church, he declined, saying he was going to make her a
long visit some time, or by and by. When he first commenced
going with her he made the remark several times that he
would like to take her to entertainments which she would
enjoy most. This is substantially the history of their court-
ship as detailed by the plaintiff, until the defendant had com-
menced keeping the company of Miss Hall, in the spring of
1888. She then tells us that her mother told her of a remark
that she had heard to the effect that the defendant had only
been going with her to please himself and to see how great a
fool he could make of her. After hearing this she met
the defendant at church and told him that she would like to
have an interview with him. He thereupon asked if he should
accompany her home and she consented. She says that this
occurred on the 15th or 20th of May. After they reached
the house she invited him in and he entered and took a
seat. She then repeated to him what she had heard, and
asked him if it was true. He said : " No, I would be a beast
of a man to go with a young lady for such a purpose as that."
He further stated that he admired her from the very first ; that
he sought her acquaintance ; that it was her face and eyes that
he admired ; that he had found her to be what her face repre-
sented and that he had never met a young lady that he
regarded more highly. To this the plaintiff replied : " Had
I not regarded you as highly as you did me I never would
have accepted your attentions as long as I have." He then
remarked that he knew it ; that he longed to make her happy ;
that he didn't know what he wouldn't do to rescue her from
trouble, and that he would always protect her. He further
stated that if the people were saying these unpleasant things
about him he would give up prayer meeting and everything
else. She said, " No, don't on that account," and he then

asked if she would go to prayer meeting if he would, and she replied, certainly. He then said, " Then I know I shall have one friend there," and he didn't know what he wouldn't do to protect her. He then stated that if she was not willing to take his word for it he would like to have her go to Mr. and Mrs. Chapman, for he went to Mrs. Chapman with all his secrets, and that she knew just what his regards for her were. The plaintiff then told him that she did not care to go to Mrs. Chapman ; that she was willing to take his word for it; that the most she wanted to know was that he was true, and he said that he was, and just before he left made the further remark, " If I live I will make you happy." The plaintiff further testified that on that occasion he made the remark that he was unsettled in life on account of his business and that he did not know what business he should engage in ; that he made inquiry as to whether her father and mother were offended at him ; that she invited him to call again and he replied that he would, but never did. She further testified that he never spoke any word of endearment to her except as above stated ; that he never kissed her or offered her any caresses ; that he always treated her with politeness and addressed her as Miss Yale. The defendant had not, at this time, called upon the plaintiff for several weeks, and she knew that he was paying attentions to Miss Hall and had met them at a banquet together. Very much of the conversation related by the plaintiff at this last interview was sharply controverted by the defendant, but inasmuch as the verdict of the jury was in her favor, we are confined on this review to her statements.

Does this evidence establish a mutual promise to marry ? We think not. It is not pretended that there was any offer of marriage prior to the last interview. There is nothing in the talk with reference to Europe, in which she was justified in drawing the conclusion that he was offering to take her with him as his wife. The query made with reference to the location of the vacant lots is one that might well have been made of any person with whom the defendant was acquainted, without a thought of marriage. The expression with refer-

ence to his making her a long visit on declining her invitation to go into the house after seeing her home from church, would to the ordinary mind hardly suggest the idea of marriage. The most that could be reasonably claimed for it was that he intended sometime to make her an independent call which should not be cut short by other engagements. We are thus brought to the expressions made use of by him at their last interview. In construing these we must take into consideration the circumstances under which they were speaking. He, as we have seen, had formed the acquaintance, and on several occasions became the escort, of another lady, and this was known to the plaintiff. Word had come to her ears of an unpleasant remark with reference to her, and this she stated to him. It was with reference to this alleged remark that he made answer; to use her expression, he denounced it as beastly and denied the truth of the remark, and then, to assure her that it was false, he proceeded to state his admiration of her; what her face and eyes had represented to him, and that he had never met a lady that he regarded more highly. He spoke of protecting her and making her happy. Upon these expressions great stress is laid, and were it not for the circumstances under which they were spoken, it is possible there would be some support for the respondent's contention with reference to them, but these circumstances she well understood. He doubtless had reference to the mental pain and suffering she had undergone by reason of the alleged remark, and he sought to remove that trouble from her mind and assure her of his protection from further trouble of that character. His expression which follows is in accord with this view, for he says: "If the people are saying these unpleasant things I will give up prayer meeting and everything else." He also told her to go to his sister, Mrs. Chapman, if she didn't believe him, and find out from Mrs. Chapman how he regarded her. The same explanation may be given with reference to his expression that he was "true." The plaintiff must have understood him as speaking with reference to her suffering, for she thereupon asked him to call

again, and in answer to his question stated that she would like their relations to continue as before. Prior to that time their relations had been that of friends. This is hardly in keeping with the theory that they had each then and there pledged each other their troth and engaged to become man and wife.

The rule governing contracts of this character has been fully discussed in the case of *Homan* v. *Earle* (53 N. Y. 267). Formerly, contracts of this character were often inferred or implied from proof of such circumstances as usually attend an engagement, but after the statute was changed so as to permit parties to testify in their own behalf they were expected to state all that was said and done so as to remove from the field of speculation facts that had theretofore been inferred, thus leaving the court to determine whether the facts sworn to constituted a contract. In determining this question, however, while we may not imply facts not sworn to, we may infer the meaning and intention of the parties. In the absence of fraud and deception there must be a contract; there must be a meeting of the minds· of the contracting parties, and the evidence must be of such a character as to justify a finding that such was the case. No form of words is required. A formal offer and acceptance is not necessary, but there must be an offer and an acceptance "sufficiently disclosed or expressed to fix the fact that they were to marry, as clearly as if put in formal words." The language used must be such as to show that the minds of the parties met. Contracts of marriage concern the highest interests of life and should be sacredly guarded. If the conduct and declarations of the parties clearly indicate that they regard themselves as engaged it is sufficient, otherwise not. Mere courtship, or even an intention to marry, is not sufficient to constitute a contract. Thorough acquaintance with character, habits and disposition is essential in order to make an intelligent contract. The parties, therefore, may form such an acquaintance without having the inferences of a contract attach. Applying these rules to the facts of this case, it is apparent that the evidence falls short of that which is necessary to establish a contract.

In considering this case, we have recognized the rule that the evidence most favorable to the plaintiff only can be considered; that if there is any evidence sufficient to uphold the contract the decision of the General Term would be final; but when there is no evidence sustaining the contract, or when the evidence given does not show that there was a contract, then the question becomes one of law, which it is the duty of this court to review. Our conclusion is that the plaintiff failed to show facts from which a contract lawfully could be inferred, and that the judgment should be reversed and a new trial granted, with costs to abide the event.

All concur, except O'BRIEN, J., not voting.

Judgment reversed.